**Julius James NASH, Petitioner,**

v.

**Thomas ISRAEL and Bronson C. La Follette, Respondents.**

**Civ. No. 81–C–1404.**

United States District Court,
E. D. Wisconsin.

March 17, 1982.

David P. Lowe, Friebert & Finerty, Milwaukee, Wis., for petitioner.

Kirbie Knutson, Asst. Atty. Gen., Madison, Wis., for respondents.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

Julius James Nash has petitioned this court for the issuance of a writ of habeas corpus. He is presently serving a life term in the Wisconsin State Prison.

On August 24, 1976, Nash withdrew his not guilty plea to a charge of first degree murder and entered a plea of guilty to the charge pursuant to a plea agreement with the state. His plea was accepted and he was sentenced on the same day to a life term.

The facts of this case establish that Ira Haskins, the ringleader of a group involved in drug trafficking, recruited Nash and three other men, Charles Holder, Elwood Garner, and Robert Neely, to murder one Felix Winters. On a pretext, arrangements were made to take Winters by car to a location in Kenosha County. When the group arrived at the spot, Holder, the driver, pulled the car to the side of the road, claiming that it had a flat tire. Holder, Garner and Neely got out of the car. Nash remained in the car, but told Winters to get out because if he didn't, both of them would be killed. Winters fled across the street, where Neely shot him several times. Upon the return to Milwaukee, Nash received some heroin and $45 for his part in the incident.

Winters was murdered on December 17, 1975. On January 27, 1976, Nash and the others were charged with first degree murder. Eventually, Garner, on the basis of a plea agreement which included the giving of testimony against others, pleaded guilty to second degree murder and received a sentence of 10 years; the sentence was stayed, and he was placed on seven years probation. Holder was subsequently tried and acquitted. Nash's jury trial was next, and on its second day he changed his plea to guilty, pursuant to the agreement which included the following terms; Nash would change his plea, receive a life sentence and testify against Neely and Haskins and, in exchange, the prosecutor would recommend to the governor that Nash's sentence be commuted to imprisonment for not more than 40 years. The recommendation to the governor was to be made after Nash testified.

After Nash testified at the trials, the District Attorney wrote to Governor Patrick J. Lucey recommending a commutation of Nash's sentence to 25 years. The trial judge also wrote a letter stating that he

had no objection to commutation. Nash's application was denied. When Martin Schreiber became Acting Governor upon the resignation of Governor Lucey, a second application was submitted. It also was denied.

On March 10, 1980, almost three and one-half years after his conviction, Nash filed a motion for post-conviction relief in the trial court pursuant to § 974.06, Wis.Stats. His motion sought an order granting him leave to withdraw his guilty plea. He claimed that the record established at the proceeding on August 24, 1976, was inadequate as a matter of law to show that he knowingly, intelligently, and voluntarily waived his constitutional rights; that regardless of the adequacy of the record, the plea was invalid because he misunderstood his maximum exposure to punishment; and that the plea was invalid because his counsel was ineffective. His motion was denied.

On February 17, 1981, the Wisconsin Court of Appeals affirmed the trial court's order denying post-conviction relief on the issues relating directly to the plea, but reversed the order on the issue of ineffective counsel. The case was remanded for an evidentiary hearing on that issue. On June 30, 1981, the Wisconsin Supreme Court denied Nash's petition for review of the issues that were not remanded and on October 23, 1981, the United States Supreme Court denied certiorari.

Nash filed his petition for a writ of habeas corpus in this court on November 3, 1981. His petition alleges that his conviction was in violation of the due process clause of the United States Constitution because he did not understand the consequences of his guilty plea and because he did not understand the charge to which he pleaded guilty.

In a decision issued two weeks ago, the United States Supreme Court held that habeas petitions alleging both exhausted and unexhausted claims should be dismissed, leaving a prisoner with the option of returning to state court to exhaust all claims or of amending his petition to present only exhausted claims to the federal district court. *Rose v. Lundy,* —— U.S. ——, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). If the latter choice is exercised, a prisoner runs the risk of being estopped from presenting, on a subsequent petition, the claims he refused to exhaust. See Rule 9(b), 28 U.S.C. § 2254.

■ In the instant case, Nash's claim of ineffective assistance of counsel is still before the Kenosha County Circuit Court following the Court of Appeals remand on that issue for the purpose of holding an evidentiary hearing. Thus, it is apparent that all of his claims are not included in the petition filed here. Despite that fact, I deem it appropriate to proceed here despite the holding in *Rose* because (1) the state has consented to proceeding on the merits of this claim despite the fact that the somewhat related issue has not been fully resolved in state court (see State's Brief filed on January 28, 1982, p. 1) and (2) the writ is going to be issued and to withhold its issuance, under the circumstances, would serve no purpose.

At the time of the change of plea, defense counsel informed the court that the parties had agreed that if Nash were to plead guilty to the crime of first degree murder as charged in the information, and that if Nash subsequently cooperated with the state in the trials of Haskins and Neely, the District Attorney would ask the governor to grant a petition for commutation of sentence from the mandatory life term to 40 years. Defense counsel stated his understanding that the court would not oppose the petition for commutation. In addition, it was agreed that steps would be taken to insure the protection of Mr. Nash (from Haskins and/or Neely) in the Wisconsin prison system including, if necessary, transferring him from the Wisconsin State Prison at Waupun to another institution.

When Nash withdrew his not guilty plea and entered his plea of guilty pursuant to the agreement with the state, the following exchange took place with the court:

"Q  Do you fully understand what the charge is that you have pled guilty to?

"A    No.

"Q    You do not understand the charge?

"A    It's been explained to me, but I can't understand it.

"Q    Do you understand that you've been charged with you and others causing the death of Felix Winters?

"A    Yes.

"Q    And you are aware that Felix Winters is dead?

"A    Yes."

The only other question regarding Nash's understanding of the charge was addressed to his counsel by the judge:

The Judge: Before the Court proceeds, I would ask you if you have had ample opportunity to talk with your client concerning the plea which he entered?

Defense Counsel: We have discussed it yesterday at some length and I talked with his family last night. We talked together this morning. There was some time pressure in terms of how long the offer would be available, but I believe we've had adequate time to discuss the matter.

The Judge: Are you satisfied that Mr. Nash understands what he is doing in regard to entering a plea to this charge?

Defense Counsel: I believe he does.

The court also established that Nash had had 12 years of education. The judge asked:

"Q    And are you entering this plea freely and voluntarily?

"A    Yes."

Defense counsel was asked prior to sentencing whether he had anything to say. The answer was:

"In view of the mandatory nature of the sentence that the Court is required to impose I don't think saying anything would be of any particular benefit other than to the court reporter."

On the basis of this record, the guilty plea was accepted and sentence was imposed. On post-conviction motions, the trial court ruled that the record "is abundantly clear

and makes it clear to anyone that read the transcript that Mr. Nash knew exactly what he was doing, that he and his counsel had discussed these matters extensively."

Viewing the record, the Wisconsin Court of Appeals found as follows:

"The record reveals that the essence of the plea agreement was discussed in Mr. Nash's presence just prior to the taking of his plea. This came after two days of trial had been completed. At that time, it was emphasized that Nash was pleading to the most serious form of homicide, first-degree murder. It was further emphasized that a plea of guilty carried with it a mandatory sentence of life imprisonment. All references to the crime and the sentence indicated that the judge would have no other choice but to impose a life sentence and that the governor would only be 'petitioned' or 'asked' to reduce the sentence from life to forty years. In order to clear up any confusion Mr. Nash may have had concerning the nature of the crime with which he was charged, the trial court engaged in questions about the acts Mr. Nash allegedly committed. The court's followup questions were reasonable efforts to clear up Mr. Nash's unspecified misunderstanding. Nash stated on the record that he had 'ample opportunity' to discuss the plea with his attorney. The record further reveals that Nash has had twelve years of schooling and that he received a copy of the criminal complaint. We, therefore, conclude that the evidence of Nash's alleged lack of understanding does not meet the requisite clear and convincing standard. The record of Nash's plea hearing adequately, albeit meagerly, shows that Nash understood the nature of his bargain."

Under 28 U.S.C. § 2254(d), the findings of the state court "shall be presumed to be correct" unless certain enumerated conditions exist. One of the conditions is that the determination is "not fairly supported by the record." The burden is on the "applicant to establish by convincing evidence that the factual determination by the state

court was erroneous." Recently, in *Sumner v. Mata*, 449 U.S. 539, 551, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981), the court held:

" . . . that a habeas court should include in its opinion granting the writ the . . . reasoning which led it to conclude that the state finding was 'not fairly supported by the record.' "

Just prior to *Sumner*, the court of appeals for this circuit had ruled that mixed questions of law and fact must be "determined independently by a federal habeas court." *Ruiz v. Cady*, 635 F.2d 584, 589 (7th Cir. 1980). Reading *Sumner* and *Ruiz* together and viewing the question here as a mixed one, I will both evaluate the state court findings and make an independent determination.

As the Wisconsin Court of Appeals notes, it is clear that the fact that the judge had power to give only one sentence for first degree murder, life imprisonment, was evident throughout the proceedings. Therefore, even though Nash was not asked if he understood the sentence which would be imposed, it is reasonable to infer that he did. Also, it is true that the statements regarding clemency referred to "petitioning" or "asking" for a reduction in sentence. However, it is also true that at one point the District Attorney stated that he would write a letter "recommending" the commutation.

██ The fact that commutation of a criminal sentence is discretionary with the governor may be, as the state argues, common knowledge. However, whether a defendant who apparently feels he is getting some sort of "deal" in order to plead guilty to first degree murder, and who is told that the prosecutor will recommend a commutation, understands that the recommendation does not have to be followed by the governor is less clear. The record here does not fairly support a finding that Nash understood "the nature of his bargain."

Additionally, Mr. Nash stated that he did not understand the charge against him. The two questions the trial judge asked Nash cannot be said to be "reasonable efforts to clear up Mr. Nash's unspecified misunderstanding." That the misunderstanding remained "unspecified" is in itself revealing. In short, the findings of the state court that Nash understood the nature of his plea are "not fairly supported by the record," especially when one considers the complexity of a charge of first degree murder, party to a crime.

The record shows that Nash was taking the unusual step of pleading guilty to first degree murder with the hope, which he apparently did not view as meaningless, that at some future time his sentence would be reduced to a term of years by the governor. In order to obtain the prosecutor's recommendation of clemency, Nash would have to testify "truthfully" in two murder trials, at some possible future jeopardy to his own life if he were to remain in the same prison as those he was to testify against. On these facts, one has to infer that he thought the prosecutor's recommendation was worth something. It is probable that he thought it made clemency much more likely than it usually is.

The fact that both the prosecutor and judge followed up on the matter, the prosecutor actually going beyond the agreement by recommending a commutation to 25 years and the judge writing that he had "no objection" to commutation, is of little importance here where the issue is what does the record disclose Mr. Nash's understanding of the situation to be. The fact that a grant of executive clemency is highly discretionary with the governor, the fact that such requests are rarely granted, and the fact that such requests often depend on which way the political winds are blowing was not explained to Nash. He should have been clearly told that what he was getting, simply put, was not very much.

Secondly, Nash expressed a lack of understanding of the crime he was pleading guilty to. No real attempt was made to find out what he did not understand, no explanation was made of how one who did not do the actual killing could be charged with and convicted of first degree murder.

Whether a purported waiver of a federal constitutional right is effective is governed by federal standards. *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). The standard applies to both issues here: whether Nash understood the charge to which he pleaded guilty and whether he understood the consequences of his guilty plea.

In regard to a defendant's understanding of the nature of the charges against him, *Henderson v. Morgan*, 426 U.S. 637, 647, 96 S.Ct. 2253, 2258, 49 L.Ed.2d 108 (1976), states:

> "Normally the record contains either an explanation of the charge by the trial judge, or at least a representation by defense counsel that the nature of the offense has been fully explained to the accused. Moreover, even without such an express representation, it may be appropriate to presume in most cases that defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit."

In *Henderson*, however, the court found that because the intent element of a second degree murder conviction was not explained, the plea was involuntary and the conviction was entered without due process of law.

Here, Nash acknowledged that defense counsel explained the nature of the charge to him. However, he also stated that even though it had been explained to him, he did not understand it. When a defendant states that he does not understand, the representation by defense counsel that counsel thinks the defendant understands is not sufficient to sustain the plea. Under the unusual circumstances of this case I believe the trial judge was compelled to ascertain for himself what Nash's understanding was. The questions asked were not sufficient to establish Nash's understanding of the charge against him.

In regard to Nash's claim that he was not informed of the consequences of his plea, two lines of cases which exist in this circuit are relevant. One involves a failure to inform the defendant of the penal consequences of a plea. In *United States ex rel. Baker v. Finkbeiner*, 551 F.2d 180 (7th Cir. 1977), the court held that the failure to inform a state criminal defendant of a mandatory parole term which accompanied his negotiated prison sentence violated the due process clause, when the parole term resulted in his being in custody for a term longer than he bargained for and longer than the trial judge stated his term would be.

In *United States ex rel. Williams v. Morris*, 633 F.2d 71 (7th Cir. 1980), *Baker, supra*, is distinguished from *U. S. v. Timmreck*, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979), in that *Timmreck* involved a technical violation of Rule 11, Federal Rules of Criminal Procedure. At sentencing, Timmreck was advised of the maximum sentence he could receive but was not informed of a mandatory parole term. However, the sentence imposed plus the parole term did not exceed the maximum term he was warned of. See also *Bachner v. U. S.*, 517 F.2d 589 (7th Cir. 1975).

In *Williams, supra*, three cases were considered. In two of the cases, relief was granted because the defendants served sentences longer than they bargained for. Another factor, however, entered into the evaluation of a plea entered by the third defendant, Emanuel Williams. His plea was upheld because although he was not told he would receive a term of parole in addition to a sentence imposed, the sentencing judge did not ratify the plea agreement and in fact informed Williams that he could be sentenced to the maximum term. Thus, Emanuel Williams' sentence did not exceed what he was warned he could get.

The second line of cases stems from *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), which requires strict adherence by the prosecution to the specific and express terms of a plea agreement. In *United States ex rel. Robinson v. Israel*, 603 F.2d 635 (7th Cir. 1979), the issue was whether a petitioner's negotiated plea to an indeterminate sentence of from 10 to 40 years violated the due process clause where, after accepting the plea and impos-

ing sentence, the judge and the prosecutor both recommended, in statutorily required statements to the Parole Board, that petitioner serve the maximum term. The petitioner was not told that the letters would be written. The court of appeals found that the trial court and the prosecutor had abided by the express terms of the agreement: petitioner was promised and received a 10–40 year sentence. Neither the judge nor the prosecutor had made any promises with regard to parole. Thus, the plea was knowing and voluntary. The court explained that a defendant must be informed of the direct consequences of a plea, but failure to explain collateral consequences—as the recommendations to the Parole Board here were—does not establish a constitutional violation.

In *U.S. v. Cook*, 668 F.2d 317 (7th Cir., 1982), the issue was whether the government breached its promise to offer nothing in aggravation of sentence when it allowed information in its possession to be included in the Probation Officer's presentence report. Although the court of appeals doubted that the promise was one which the government was allowed to fulfill, it stated, "A plea induced by an unfulfillable promise is no less subject to challenge than one induced by a valid promise which the government simply fails to fulfill." Finding that the government had made the promise, the court found that it had been breached, and that the defendant should be allowed to withdraw his plea.

In Nash's case, both the prosecution and the judge were in technical compliance with the agreement. The prosecutor, as stated above, wrote his letter "recommending" commutation. The trial judge, although stating he was not a party to the agreement, wrote the governor stating that he did not oppose commutation. Thus, technically, the second line of cases may not apply: there was no breach of the agreement.

Also, if one is to be technical, the first line of cases does not apply. Although the defendant was not asked specifically, the record is sufficiently clear that everyone was proceeding on the understanding that a life term was the only sentence the judge was empowered to impose. On this issue, viewing the record mechanically, one can say that no violation exists.

However, the spirit of the law is violated in this case. This is the reverse of *Timmreck, supra*: there, technical defects did not create a due process violation; here, technical compliance does not assure due process.

To enter a plea to first degree murder—party to a crime—is a highly unusual step. To enter that plea and agree to testify against those who also participated in the crime, while knowing that unless protective measures are taken, everyone convicted would eventually be sent to Wisconsin's only maximum security adult prison, is even more unusual. The situation raises an inference that Nash thought his plea was of some benefit to him. Accepting such a plea requires a more careful than usual determination of what Nash knew and what he understood the consequences to be. It requires especially that Nash understand the entirely discretionary nature of gubernatorial commutation of sentence. When the reason for the plea is the chance of commutation, commutation cannot be said to be a "collateral" consequence of the plea. It is the essential element in the bargain.

Coupling the failure to inform Nash of the consequences of his plea with the fact that Nash stated that he did not understand the charge, I find that he was denied due process of law. This is not to say that Nash is not guilty of first degree murder or some lesser degree of homicide. It is to say, however, that he was not fairly convicted.

IT IS ORDERED that the petitioner be permitted to withdraw his plea of guilty. Judgment will be stayed for 90 days to allow the state to give Nash a trial or to dispose of the matter against him by other means.

SO ORDERED.